IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MEDIOSTREAM, INC., | Case No. C 11-2525 RS |
| Plaintiff, | |
| v. | **ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT** |
| MICROSOFT CORPORATION, et al., | |
| Defendants. | |

## I. INTRODUCTION

This long-running patent litigation originally involved multiple claims from two patents asserted against numerous defendants representing a substantial portion of the personal computer industry. As a result of settlements and other developments, only two claims of one patent remain in dispute, and only a single defendant, Dell, Inc., has not been dismissed. Now pending are two motions for summary judgment, one seeking a finding that the patent claims are invalid as anticipated by a particular piece of prior art, and another arguing the infringement claims are barred by the terms of a settlement agreement plaintiff MedioStream, Inc. reached with Microsoft Corporation, and/or by the doctrine of patent exhaustion, given that settlement.  Both motions will

be granted, and stand as separate and independent grounds to support entry of judgment in Dell's favor.

## II.  BACKGROUND

This action was initiated in the Eastern District of Texas, and, as noted, originally involved two patents and a multitude of defendants. A claim construction order was issued prior to the transfer of the matter to this district. The parties are well familiar with the long course of the litigation including the activities in the PTO, various settlements, and stipulations, which have had the combined effect of leaving only Dell facing infringement allegations on two patent claims.

Prior to their departure from the litigation, former defendants Sony Corporation and Sony Electronics, Inc. brought a motion that the patent claims then still pending were invalid in light of various prior art. Although the Sony entities settled prior to a decision on that motion being rendered, by prior order Dell has been permitted to rely on the arguments they made. Because fewer claims are in issue now, the sole question presented by that motion is whether a product known as "VideoFactory 2.0" is invalidating prior art.

Dell, in conjunction with former defendant Sonic Solutions, Inc. also filed a separate motion for summary judgment on grounds that a settlement reached between MedioStream and former defendant Microsoft Corporation barred the remaining claims. Sonic was then dismissed pursuant to a stipulated order.[1] The sole question on that motion, therefore, is whether the Microsoft settlement agreement extends to products sold by Dell, either by its terms or through application of the doctrine of patent exhaustion, or both.

## III.  LEGAL STANDARDS

Summary judgment is proper "if the pleadings and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the

---

[1] Sonic's motion for attorney fees and costs remains under submission.

pleadings and admissions on file, together with the affidavits, if any which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323 (citations and internal quotation marks omitted). If it meets this burden, the moving party is then entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which he bears the burden of proof at trial. *Id*. at 322-23.

The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party cannot defeat the moving party's properly supported motion for summary judgment simply by alleging some factual dispute between the parties. To preclude the entry of summary judgment, the non-moving party must bring forth material facts, i.e., "facts that might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 588 (1986).

The court must draw all reasonable inferences in favor of the non-moving party, including questions of credibility and of the weight to be accorded particular evidence. *Masson v. New Yorker Magazine, Inc*., 501 U.S. 496 (1991) (citing *Anderson*, 477 U.S. at 255); *Matsushita*, 475 U.S. at 588 (1986). It is the court's responsibility "to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec. Service v. Pacific Elec. Contractors*, 809 F.2d 626, 631 (9th Cir. 1987). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

## IV. DISCUSSION

### A. Invalidity

#### 1. VideoFactory 2.0 as prior art

In July of 2001, a company called Sonic Foundry, Inc. introduced the VideoFactory 2.0 software product. The parties' initial dispute is whether VideoFactory 2.0 constitutes "prior art" to the patent in suit, U.S. Patent No. 7,009,655. Given the earliest date of the filing of an application leading to the '655 patent, the parties are in agreement that VideoFactory 2.0 qualifies as prior art only if was on sale and sold prior to July 23, 2001. Dell[2] has shown through documentary evidence that an entity known as the Douglas Stewart Company ("DSC") sent Sonic Foundry a purchase order for twenty units of VideoFactory 2.0 on July 17, 2001, and that on or before July 20, 2001, Sonic Foundry sent an invoice to DSC in response to that purchase order. MedioStream's argument that various press materials suggest a slightly later "release date" for the product is insufficient to create a triable issue of fact undermining Dell's showing that at least one sale occurred prior to the relevant date.

#### 2. Claim elements

Claims 10 and 11 of the '655 patent are the sole remaining claims in suit. Both depend from claim 1. In broad terms, the invention of the '655 patent is a system, implemented in computer software and primarily intended for use by consumers, for converting video information from various input formats (including streaming video from internet sources) into various standard formats that are typically stored on optical disks, such as DVD, VCD (a lower quality standard uncommon in the US, but once prevalent elsewhere), Super VCD ("SVCD"), and potentially others. A key feature of the invention is that the process converts the video directly into the desired format, without creating "intermediate" files—prior art products purportedly operated more slowly and required additional memory because they typically used such intermediate files in the conversion process.

---

[2] As noted, the briefing was originally prepared and presented by the Sony entities. Dell has adopted Sony's argument by its joinder.

1    In the language of claim 1, the invention is: "A system for converting video information
2 from an incoming format to an outgoing format using an integrated computer software application . .
3 . ." Claim 10 recites "the system of claim 1," and adds a limitation related to tuning the audio
4 information contained in the video to "a desired frequency." Claim 11 recites the system of claim
5 10 (thereby also including claim 1) and adds the limitation that the "desired frequency" be selected
6 from among certain specified numerical frequencies (48 kHz or 44.1 kHz, depending on the video
7 format).

   The patent describes the system for converting from the "incoming format" to the "outgoing
format" in several steps, but critical to the present motion are only the following:

   a. The system allows a user to select[3] a desired "output media format"—which has been construed in this litigation to mean a "standard video format for an optical disk." The claim construction order expressly explains these include the DVD, VCD, and SVCD video playback standards.

   b. The user also selects a "desired TV standard"—which undisputedly refers either the NTSC standard used in television sets sold in the United States market, or the PAL standard used in Europe.

   c. The end product of the conversion is then a "presentation format"— representing the combination of the output media format and the desired TV standard. Thus, for example, the presentation format could be DVD/PAL, VCD/NTSC, or any other combination of a standard video format and one of the two TV standards. The claim construction order construed the term as "the playback format for video and audio information for the desired standard video format for optical disk using the desired TV standard [or video presentation standard]."

   The parties' dispute here ultimately turns on the meaning of "presentation format," and more specifically, whether the system claimed by the patent—the invention—must have the ability to

---

[3] The claim construction order adopts the construction "inputting/receiving" rather than "selecting" to describe this aspect of the claims, for reasons explained in that order. Although "select" may be less precise, for purposes of this order those distinctions are not material and using the term enhances readability.

5

1  "burn" an optical disk such that it can be played directly on an ordinary DVD or VCD player—as
2  opposed simply to creating a video *file* on an optical disk that can be read by a computer—even if
3  that file is compliant with a particular combination of video and TV standards.  Initially, however,
4  Dell contends that even assuming the system must be able to "burn" an optical disk, the
5  VideoFactory 2.0 could in fact do so, and therefore is invalidating prior art (given that its ability to
6  meet all other claim limitations is undisputed).

7  The evidence shows VideoFactory 2.0 was capable of "burning" a disk in the VCD format,
8  that was compliant with NTSC.[4]  Dell argues this is sufficient to meet any claim limitation requiring
9  an ability to burn disks because, in its view, the claim requires only *one* "presentation format."  That
10 contention is not persuasive.  Although the claim does use the term "presentation format" in the
11 singular, it is plain that such format must result from the selection of one among several video
12 standards, combined with a choice of either PAL or NTSC.   Put differently, the system produces a
13 specific output reflecting a particular combination of selected inputs. While the output can be
14 referred to in the singular as it is only one of the possible choices, the system must still be able to
15 provide multiple outputs to correspond to the possible combinations of inputs.  Accordingly, the fact
16 that VideoFactory 2.0 could burn a VCD/NTSC disk is insufficient to meet the claim limitation, *if*
17 producing a "presentation format" were construed to mean burning an optical disk such that it can
18 be played directly on an ordinary DVD or VCD player.

19 Contrary to MedioStream's argument, however, nothing in the claim language or the prior
20 construction order suggest there is any reason that "presentation format" refers exclusively to an
21 optical disk that can be played directly on a DVD or VCD player.   Indeed, dependent claim 8 of the
22 '655 patent expressly states that the presentation format may be selected from a group including
23 "VCD MPEG1."  There is no dispute that a VCD MPEG1 is a file format that cannot be played
24 directly on a VCD player.

---

[4] Dell contends VideoFactory 2.0 could also burn disks in VCD/PAL. It contends a statement in the manual asserting PAL was "not supported" only meant the company did not provide technical support should problems arise when attempting to burn a PAL disk, but that it could still be done. MedioStream, however, points to screen shots appearing to show that PAL was not an available option when burning a disk. Thus, Dell has only established as a matter of undisputed fact that VideoFactory 2.0 could burn VCD/NTSC disks.

Additionally, dependent claim 7 adds the "further" limitation of "writing the video and audio information in the presentation format onto a disk media." While *either* an MPEG1 file or player-ready information may be written onto a "disk media," the import of this dependent claim is that for purposes of claim 1 the information in the presentation format need not be written to a disk at all—the claim is satisfied upon processing of the information, regardless of if, how, or when it is ever stored on a fixed medium for playback. Since the "presentation format" need not be stored on disk at all, there can be no requirement of a disk playable directly in a DVD or VCD player.

Moreover, during claim construction proceedings, MedioStream abandoned its request for a construction including a limitation that the "presentation format" be "recognized by a player." The claim construction order simply did not decide the precise argument presented here. While the order observed that the presentation format must be a "playback" format distinct from "output media format," it did not distinguish between MPEG1 files that can be played back on a computer and disks burned for direct playback on DVD or VCD players.

There is no dispute that VideoFactory 2.0 could produce MPEG-1 files compliant with multiple standard video formats and with either PAL or NTSC. While MedioStream insists those were only "intermediate files" rather that presentation formats, the plain language of the patent is to the contrary. Accordingly, notwithstanding the failure of Dell's argument that the claim can be satisfied by a system capable of producing a single presentation format, it has shown as a matter of undisputed fact that VideoFactory 2.0 meets all the limitations of claim 1 such that the claim is invalid. *See Schering Corp. v. Geneva Pharmaceuticals, Inc.*, 339 F.3d 1373, 1379 (Fed. Cir. 2003) ("a prior art reference [that] expressly or inherently contains each and every limitation of the claimed subject matter anticipates and invalidates.")

At the time this motion was originally filed, reexamination proceedings in the PTO had already resulted in the rejection of claim 1, but for reasons not explained by the parties, dependent claims 10 and 11 still stood. In this motion, however, no argument has been presented that claims 10 and 11 contain additional limitations that somehow permit those claims to survive notwithstanding the invalidity of claim 1 in light of VideoFactory 2.0. Therefore, the motion for summary judgment that the remaining asserted claims are invalid will be granted.

### B. Microsoft settlement

As noted, MedioStream and Microsoft entered into a settlement agreement in this action.[5] Dell contends the terms of that agreement effectively extend to the software products it sells with its computers that form the basis of MedioStream's infringement claims against it. Alternatively, Dell argues the doctrine of patent exhaustion bars MedioStream's claims because the settlement agreement effectively grants a license to practice the patent on computer systems it sells containing Microsoft Windows, even if it installs additional unlicensed software on those computers that would be subject to infringement claims absent the license.

Two categories of software installed on Dell computers are relevant to the analysis. First, Dell sold computers loaded with the Windows operating system, which allegedly infringed or induced infringement by virtue of features developed by Microsoft and/or features incorporated from certain software known as "AuthorScript."[6] MedioStream acknowledges that any claims it held against Dell arising from the installation of Windows and/or AuthorScript on computers are now released and barred by the terms of the Microsoft settlement agreement.

The issue is whether MedioStream can still pursue claims arising from two "stand alone" software products that Dell obtained from former defendant Sonic, and preinstalled on some of the computers it sold. These products were known as MyDVD and Easy Media Creator ("Creator").[7]

---

[5] The terms of the settlement agreement purport to be confidential, which has resulted in the parties submitting requests to seal large swathes of their briefing and exhibits offered in this motion. The fact of the settlement is already in the public record, and there are no confidentiality concerns implicated by generic provisions of the agreement or by those terms relating to matters discussed in this order such as the scope of the agreement. Accordingly, the sealing orders are hereby provisionally denied, except that the settlement agreement itself may be filed under seal, and any references in the briefing or other documents to the dollar amount of the settlement may be redacted. In the event there are any other provisions of the agreement in which Microsoft or MedioStream has a legitimate confidentiality interest, within seven days of the date of this order they may file a further declaration or declarations explaining the basis of any such claim and specifically identifying what portions of the briefing or other documents warrant filing under seal. Otherwise, the parties should refile their papers with only the dollar figures redacted and only the settlement agreement itself under seal.

[6] AuthorScript was licensed to Microsoft by former defendant Sonic.

[7] Dell and Sonic's joint brief in support of summary judgment based on the Microsoft settlement agreement asserted that no claims against MyDVD and Creator were asserted under claims 10 and 11 of the '655 patent, and that the claims related to those products were abandoned when

The Microsoft settlement agreement grants a license from MedioStream to Microsoft *and to all upstream and downstream parties in the Microsoft supply chain* with respect to "Microsoft Covered Technology."

MedioStream contends MyDVD and Creator are outside the scope of the agreement by virtue of Section 3.2. That section provides, in relevant part:

> Nothing in this Agreement grants rights, directly or indirectly, to. . . OEM Manufacturers [e.g. Dell] based upon their use of software created by a Specific Third Party that <u>is not shipped with or included with</u> Microsoft Covered Technology . . . .

(Emphasis added.)

Section 3.2 also provides that in no event may MedioStream "rely on any Microsoft Covered Technology to meet any element, preamble, step, or limitation of any claim" when pursuing patent infringement against any person.

"Specific Third Party" is defined in the agreement to include Sonic. Accordingly, the first question is whether MyDVD and Creator are "shipped with" Windows within the meaning of the agreement. If they are, there is no dispute the agreement bars MedioStream's remaining claims against Dell. Even if MyDVD and Creator are *not* "shipped with" Windows within the meaning of the agreement, however, MedioStream cannot prevail if its infringement claims against it depend on how those programs work with Windows to meet "any element, preamble, step, or limitation" of the asserted patent claims.[8]

---

MedioStream dismissed U.S. Patent No. 7,283,172 from this action. While that may have been correct as to any infringement claims against Sonic, Dell appears not to dispute that MedioStream is pursuing infringement claims directly against it under the '655 patent arising from its distribution of MyDVD and Creator.

[8] MedioStream suggests it may still prevail if it only relies on Windows "in part" to meet any "element, preamble, step, or limitation" of the claims. MedioStream points to the drafting history showing that the phrase, "in whole or in part" was deleted from Section 3.2 (but not from two other sections) at its insistence. The change from "shall not rely . . . in whole or part" to "shall not rely," does not somehow permit reliance "in part." The phrase that remains, "shall not rely" plainly encompasses partial reliance, whether or not so expressly stated. The change eliminated redundancy, but had no substantive effect. Because it is unclear whether MedioStream intends to rely on Windows at all to prove infringement, summary judgment will not be entered on this

MyDVD and Creator are undisputedly "shipped with" Windows, when Dell ships out its computers to its customers. MedioStream argues, however, that "shipped with" means software shipped with Windows *by Microsoft—*i.e., when it provides copies of Windows to Dell. There is, of course, no dispute that MyDVD and Creator are *not* shipped by Microsoft.

MedioStream contends its construction makes sense because the parties to the settlement plainly intended to preserve the claims against independent third party software such as MyDVD and Creator. Dell argues there is no basis to insert, in effect, the phrase "by Microsoft" where it does not appear in the contractual language. Dell points out that construing the contract according to its plain language does not lead to a meaningless or absurd result, because MedioStream still retains the right to pursue infringement claims arising from any standalone sales of MyDVD and Creator or when those programs are packaged with non-Microsoft operating systems such as Linux.

> Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. Such intent is to be inferred, if possible, solely from the written provisions of the contract. The clear and explicit meaning of these provisions, interpreted in their ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage controls judicial interpretation. Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning.

*Santisas v. Goodin*, 17 Cal. 4th 599, 608 (1998) (citations and quotations omitted).

It may very well be that MedioStream had the subjective, undisclosed, intent to preserve its claims against Dell arising from MyDVD and Creator. It is also reasonable to infer that while Microsoft may not have had any incentive to protect third parties against truly independent infringement claims, it likely intended the release to extend to claims against third parties where any colorable indemnification claim could be made.

In any event, whatever subjective intent MedioStream and Microsoft may have each held, their mutually expressed written agreement is not subject to the interpretation advanced by MedioStream. The agreement does not contain the phrase "by Microsoft" following the word "shipped," and there is no basis for effectively rewriting the parties' contract to include it.

---

additional ground; it nevertheless appears likely it could present an additional insurmountable hurdle for MedioStream.

Accordingly, as there is no dispute that Dell only shipped MyDVD and Creator with machines that also contained Windows, the Microsoft settlement forecloses MedioStream's remaining claims, and summary judgment is warranted on this additional, independent, ground.[9]

## V. CONCLUSION

The pending motions for summary judgment are both granted. A separate judgment will issue.

IT IS SO ORDERED.

Dated: 12/17/13

RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE

---

[9] The viability of Dell's additional argument based on patent exhaustion depends on whether once a particular computer is licensed to practice the patent (i.e., by installing Windows) a separate infringement claim can still be brought if other (unlicensed) software that practices the patent is installed on the same machine. Neither party has presented authority directly on point as to whether such a computer with two different programs practicing the patent should be deemed as one "system" such that patent exhaustion might apply, or as two separate systems, such that it would not. In light of the conclusions reached above, the issue need not be decided here.